**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MARVIN POWELL,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| **SAINT JOSEPH'S UNIVERSITY,** | **NO.  17-4438** |
| **WILLIAM BORDAK,** | |
| **LAURA EGAN, and** | |
| **ANDREW SHAPREN,** | |
| **Defendants.** | |

**DuBois, J.**                                                                **February 16, 2018**

# M E M O R A N D U M

## I.        INTRODUCTION

In this suit stemming from the investigation by defendant Saint Joseph's University ("University") into allegations of sexual misconduct against plaintiff, plaintiff alleges that the University, its employees, and an outside investigator hired by the University, discriminated against him on the basis of sex.  Plaintiff's Amended Complaint sets forth claims for breach of contract, violation of Title IX, negligence, and violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL").  Before the Court is the Motion to Dismiss Plaintiff's Amended Complaint filed by the University and William Bordak.[1]  The Court concludes the Amended Complaint states a plausible claim for relief only for plaintiff's contract claim.  Thus, defendants' Motion to Dismiss is denied as to that claim and granted as to all other claims.

---

[1] Defendants Laura Egan and Andrew Shapren have not yet been served with process.

1

## II. BACKGROUND

The facts below are drawn from plaintiff's Amended Complaint and the documents upon which it relies.[2]  The Court construes the Amended Complaint in the light most favorable to the plaintiff, as it must in a motion to dismiss.  Those facts may be summarized as follows:

Sometime in early 2015, plaintiff enrolled in a course at the University described as a "sophomore seminar."  Am. Compl. ¶¶ 13-14.  In February 2015, three female students in the seminar filed separate complaints against plaintiff with University officials.  Am. Compl. ¶ 14. The complaints alleged that, outside of the seminar classroom, plaintiff confronted the three female students multiple times about their "feminist" beliefs and stared at them during the seminar.  Doc. No. 1, exh. D.  Following the filing of the complaints, the University began an investigation into plaintiff's conduct to determine whether it violated the University's Interim Policy Regarding Sexual Assault, Sexual Exploitation, Domestic Violence, Dating Violence, or Stalking for Student Respondents ("Interim Policy").  Am. Compl. ¶ 14

The Interim Policy prohibits a range of activities, collectively referred to as "Sexual Misconduct," including Sexual Assault, Domestic Violence, Dating Violence, Sexual Exploitation, and Stalking.  Doc. No. 1, exh. A at 6.  Plaintiff was investigated for violating the Interim Policy's prohibition on "Stalking," defined as "[e]ngaging in a course of conduct

---

[2] In the Amended Complaint, plaintiff quotes the University's relevant policies, refers to a document signed by plaintiff at a Pre-Investigation Meeting with defendant William Bordak, and refers to a letter plaintiff received summarizing the findings of defendant Andrew Shapren, the University's outside investigator.  The Amended Complaint states that the documents are attached as Exhibits A-D, but those exhibits were not attached to the copy of the Amended Complaint filed with the Court.  However, the original Complaint, substantially similar to the Amended Complaint, includes the same documents as exhibits.  Because this Court may consider "undisputedly authentic documents if the complainant's claims are based upon these documents" in deciding a motion to dismiss, *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010), the Court concludes that the documents attached to the original Complaint are properly before the Court in deciding defendants' Motion to Dismiss the Amended Complaint.

directed at a specific person that would cause a reasonable person to fear for his or her safety or the safety of others; or suffer severe emotional distress." *Id.* at 12; Doc. No.1, exh. D.

The Interim Policy provides procedures for investigating alleged Sexual Misconduct. Once a complaint is filed with University officials, the University hires an outside investigator to assess the complaint. Doc. No. 1, exh. A at 28. The investigator "must be professionally trained to conduct Sexual Misconduct investigations, and his or her objectivity should not be compromised by a previously-existing relationship" with the parties. *Id.* The Interim Policy allows any involved party to object to the investigator within twenty-four hours of receiving notice of his or her name. *Id.* The Interim Policy also provides that "[p]rior to commencement of the investigation, individual pre-investigation meetings may be scheduled with the" parties. *Id.* Finally, the Interim Policy states that "investigation shall include interviews with the parties and witnesses, and review of any relevant documents or other evidence" and that the investigator is to provide a report summarizing his findings "based on a preponderance of the information." *Id.* at 28, 30.

Pursuant to the Interim Policy, the University hired defendant Andrew Shapren to investigate the complaints against plaintiff. Am. Compl. ¶ 15. Prior to the commencement of Shapren's investigation, defendant William Bordak, an employee of the University, held a Pre-Investigation Meeting with plaintiff. Am. Compl. ¶¶ 5, 21. During the meeting, plaintiff reviewed a document stating the "terms" of the investigation. Am. Compl. ¶ 5. The document identified Shapren as the outside investigator. Doc. No. 1, exh. C at 2. The document also stated that "[i]f during the course of the investigation other conduct that might be a violation of this or other University policies is discovered or identified, this additional conduct must be reported to the appropriate University Official(s) and may be subject to a separate process." *Id.* The same

provision appears in the Interim Policy. Doc. No. 1, exh. A at 28. Both plaintiff and Bordak signed the document at the Pre-Investigation Meeting. Doc. No. 1, exh. C at 4.

During the course of his investigation, Shapren interviewed Powell and the three female students. Am. Compl. ¶ 19. In an interview with Shapren, plaintiff was critical of the clothing of one of the women as sexually suggestive and inconsistent with her "feminist viewpoint." Doc. No. 1, exh. D. Shapren also reviewed a drawing by plaintiff, which depicted one of the female students as an "evil feminist vampire" and a "blood sucking leech" biting off the head of a man. Am. Compl. ¶ 34; Doc. No. 1, exh. D. In his report, however, Shapren concluded that plaintiff "more likely than not" did not violate the Interim Policy for Stalking because a reasonable person would not fear for her safety or suffer from severe emotional distress due to plaintiff's conduct. Am. Compl. ¶ 18; Doc. No. 1, exh. D.

Despite finding that plaintiff did not violate the Interim Policy, Shapren concluded that plaintiff violated a second University policy, the Policy Prohibiting Discrimination, Harassment and Retaliation ("PPDHR"). Am. Compl. ¶¶ 6, 11; Doc. No. 1, exh. D. The parties provided two versions of the PPDHR to the Court. First, with respect to that policy, the Court must determine which version is applicable to this case. There is a version of the PPDHR attached to plaintiff's original Complaint, but not the Amended Complaint. Unfortunately, that version of the policy is dated November 20, 2015, and is inapplicable to the conduct in question, which occurred prior to plaintiff's expulsion on April 13, 2015. Doc. No. 1, exh. B; Am. Compl. ¶ 28. The version of the PPDHR attached to defendants' Motion to Dismiss is stamped, "Student Handbook Revised: 1/15/2015," a date prior to the events in this case. Doc. No. 7, exh. 2 at 77. That is the policy that is applicable to this case.

Based on the PPDHR dated January 15, 2015, in effect at the time relevant to this case, Shapren found that plaintiff violated the PPDHR's prohibition on "Harassment." Shapren correctly relied on the definition of "Harassment" in that version of the PPDHR—"any unwelcomed, unsolicited and offensive conduct that tends to injure, degrade, disgrace or show hostility toward a person because of his or her membership in a class of persons protected by law. . . . For an incident to constitute harassment, it must be offensive to a reasonable person." Doc. No. 7, exh. 2 at 77. The PPDHR further provides that "[t]he law prohibits discrimination and harassment on the basis of sex/gender, race, age of 40 or over, color, religion, national origin, ethnic origin, sexual orientation, disability, marital status, and military and military veteran status." *Id.*

Plaintiff contends that Shapren reached his conclusion that plaintiff violated the PPDHR by using an erroneous definition of Harassment. Am Compl. ¶¶ 28-30; Doc. No. 1, exh. B at 3. Plaintiff's argument is rejected. In making that argument, plaintiff relies on the PPDHR dated November 20, 2015, after the events in question. As noted above, that version of the PPDHR is not applicable to this case.

Shapren, who was retained to investigate a potential violation of the Interim Policy, concluded that he could consider violations of the PPDHR because the Interim Policy provides, "If particular conduct by student respondent would be prohibited by both the PPDHR and this Policy, this Policy controls." Am. Compl. ¶ 19; Doc. No. 1, exh. A at 4. Shapren did not report to the University that he was considering violations of the PPDHR, despite the provision of the Interim Policy requiring that the discovery of "other conduct . . . must be reported" to the University. Am. Compl. ¶¶ 25-26. Shapren concluded plaintiff violated the PPDHR's

prohibition on Harassment because his conduct was "motivated by gender" and was "offensive to a reasonable person." Doc. No. 1, exh. D.

Defendant Laura Egan made the final decision to expel plaintiff. Am. Compl. ¶ 42. Plaintiff was informed of the University's decision to expel him by letter dated April 13, 2015. Doc. No. 1, exh. D.

Plaintiff filed a Complaint in the Court of Common Pleas of Philadelphia County on September 7, 2017. Defendants removed the case to this Court on October 4, 2017. Plaintiff filed his Amended Complaint on October 26, 2017. The Amended Complaint sets forth four claims against each of the defendants: breach of contract, violation of Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681, negligence, and violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Penn. Stat. § 201-1 *et seq.* The University and Bordak filed the present Motion to Dismiss on November 17, 2017. Defendants' Motion is ripe for decision.

## III. LEGAL STANDARD

"The purpose of a 12(b)(6) motion to dismiss is to test the legal sufficiency of the complaint," not the merits. *Nelson v. Temple Univ.*, 920 F. Supp. 633, 634 n.2 (E.D. Pa. 1996). To survive a motion to dismiss, plaintiff must allege "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663. In assessing the plausibility of the plaintiff's claims, a district court first identifies those allegations that constitute nothing more than "legal conclusions" or "naked assertions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555, 557 (2007). Such allegations are "not entitled to the assumption of

truth." *Iqbal*, 556 U.S. at 679.  The court then assesses "the 'nub' of the plaintiff['s]

complaint—the well-pleaded, nonconclusory factual allegation[s]"—to determine whether it

states a plausible claim for relief.  *Id.*  "In deciding a Rule 12(b)(6) motion, a court must consider

only the complaint, exhibits attached to the complaint, matters of public record, as well as

undisputedly authentic documents if the complainant's claims are based upon these documents."

*Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

## IV.    DISCUSSION

In their Motion to Dismiss, defendants argue: (1) plaintiff's contract claim should be

dismissed because plaintiff does not specify which university policies defendants breached;

(2) plaintiff's Title IX claim should be dismissed because he does not allege any facts supporting

an inference of discriminatory intent based on sex; (3) plaintiff's negligence claim is barred by

the gist of the action doctrine; and (4) under Third Circuit precedent, plaintiff's UTPCPL claim

is barred by the economic loss doctrine.

Plaintiff responds that (1) he has stated a claim for breach of contract because he did not

receive notice of and an opportunity to respond to the charges against him under the PPDHR as

required by that policy; (2) he has stated a claim for violation of Title IX because the Amended

Complaint alleges that he was an African-American male whose accusers were all white women;

these allegations, plaintiff contends, are sufficient to establish an inference of discriminatory

intent; and (3) the Amended Complaint alleges sufficient facts to support an inference of

deceptive conduct and ascertainable loss under the UTPCPL.  In his Answer [*sic*] to the Motion

to Dismiss, plaintiff does not address either dismissal of his negligence claim or defendant's

argument that the economic loss doctrine bars his claim under the UTPCPL.

## A. Breach of Contract

Defendants first argue that plaintiff has failed to state a claim for breach of contract. The "relationship between a private educational institution and an enrolled student is contractual in nature." *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. Ct. 1999); *accord Barker v. Bryn Mawr Coll.*, 122 A. 220, 221 (Pa. 1923). Thus, to state a claim against a university, a student plaintiff must allege "there was a contract, the defendant breached it, and plaintiff[] suffered damages from the breach." *McShea v. City of Phila.*, 995 A.2d 334, 340 (Pa. 2010). The contract between a student and a university is "is comprised of the written guidelines, policies, and procedures as contained in the written materials distributed to the student over the course of their enrollment in the institution." *Swartley*, 734 A.2d at 919. Courts review the agreement between a student and a private university "as [they] would any other agreement between two private parties." *Reardon v. Allegheny Coll.*, 926 A.2d 477, 480 (Pa. Super. Ct. 2007) (citing *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 428 (Pa. 2001)). Consequently, a breach of contract claim against a private university "must relate to a specific and identifiable promise that the school failed to honor." *Vurimindi v. Fuqua Sch. of Bus.*, 435 F. App'x 129, 133 (3d Cir. 2011).

### 1. *Contract Claims Against the University*

In this case, the Amended Complaint sufficiently alleges that the University failed to provide plaintiff notice of and an opportunity to respond to the charges against him under the PPDHR, as required by that policy. *See* Am. Compl. ¶¶ 49(a)-(b), (e). As an initial matter, the defendants concede the existence of a contractual relationship between plaintiff and the University. Defs'. Mem. Law Supp. Mot. Dismiss, Doc. No. 7-1 at 11. Plaintiff argues that, under this contractual relationship, defendants should have investigated plaintiff's conduct under the PPDHR, not the Interim Policy. Doc. No. 9 at 11-12. As noted above, the Interim Policy

provides, "If particular conduct by student respondent *would* be prohibited by both the PPDHR and this Policy, this Policy controls."  Doc. No. 1, exh. A at 4 (emphasis added).  Because Shapren ultimately found that plaintiff violated *only* the PPDHR, plaintiff argues that this provision of the Interim Policy does not apply and plaintiff should have been investigated under the PPDHR.  Doc. No. 9 at 11.  The Court agrees.

Moreover, plaintiff alleges that defendant's failure to investigate plaintiff under the PPDHR deprived him of notice of the charges against him and an opportunity to respond, as required by the PPDHR.  Am. Compl. ¶ 49(e).  The PPDHR requires the delivery of the complaint to the accused student and an opportunity to respond in writing.  Doc. No. 7, exh. 2 at 83.  In contrast, the Interim Policy provides only that a Pre-Investigation Meeting "may" be scheduled with the accused student.  Doc. No. 1, exh. A at 28.  Plaintiff did not receive either of those safeguards provided in the PPDHR.  Coupled with plaintiff's allegation that Shapren failed to report that plaintiff may have violated the PPDHR before including it in his report, Am. Compl. ¶¶ 25-27, these allegations are sufficient to state a claim that the University violated the PPDHR's requirement that a student under investigation be given notice and an opportunity to respond.

The University argues that plaintiff's interpretation of the Interim Policy and the PPDHR would require it "to investigate plaintiff twice, once for sexual misconduct and once for sexual harassment under two different policies with two different sets of procedures."  Doc. No. 13 at 2. The Court disagrees.  As an initial matter, the Interim Policy expressly contemplates that "other conduct" discovered during the course of an investigation "may be subject to a separate process." Doc. No. 1, exh. A at 28.  More importantly, plaintiff does not claim that the University is required to conduct two investigations in every case, but merely to adhere to the requirements of

its policies. Once Shapren determined that the Interim Policy was no longer applicable to plaintiff's conduct and that the PPDHR was, the University and Shapren were required to proceed under the correct policy—in this case, the PPDHR. The allegations of the Amended Complaint are sufficient to survive a motion to dismiss, and defendants' Motion is denied as to plaintiff's breach of contract claims based on the PPDHR, as set forth in subparagraphs 49(a)-(b) and (e) of the Amended Complaint.

The Amended Complaint, however, fails to set forth sufficient factual allegations to support the remainder of the breach of contract claims against the University in Count I of the Amended Complaint. Plaintiff alleges that the University failed to hire a qualified investigator and applied a "lax" standard of proof in the investigation. Am. Compl. ¶ 49(k)-(*l*). Although these claims are related to specific provisions in the Interim Policy, they are not supported by adequate factual allegations. The Interim Policy provides that the investigator "must be professionally trained to conduct Sexual Misconduct investigations" and must make his findings "based on a preponderance of the information." Doc. No. 1, exh. A at 28, 30. The Amended Complaint, however, alleges no facts regarding Shapren's background or why his findings were not supported by a preponderance of the information. Thus, plaintiff's claims in subparagraphs 49(j)-(*l*) of the Amended Complaint are dismissed without prejudice.

Finally, plaintiff's claims that the University violated a variety of procedural safeguards other than the notice and response requirements of the PPDHR are not based on any specific contractual obligations imposed on the University. *See* Am. Compl. ¶ 49(c)-(d), (f)-(j), (m). These claims include allegations that the University conducted a biased investigation, wrote a "superficial, conclusory, and capricious" investigation report, failed to provide plaintiff with that report prior to interviewing him, denied plaintiff "basic due process," and provided "a

disciplinary process that was fundamentally unfair." *Id.* At a private university, however, a student is "entitled only to those procedural safeguards which the school specifically provides" in its contract with the student. *Boehm v. Univ. of Pa. Sch. of Veterinary Med.*, 573 A.2d 575, 579 (Pa. Super. 1990). A private university's disciplinary process "do[es] not give rise to 'fairness' obligations that are independent of, and separate from, the obligations imposed by the more specific provisions" in the parties' contract. *Doe v. Trs. of the Univ. of Pa.*, No. 16-5088, 2017 U.S. Dist. LEXIS 148086, at *18 (E.D. Pa. Sep. 13, 2017). Plaintiff has not identified which provisions of University policy require the procedural safeguards that defendants are alleged to have breached in subparagraphs 49(c)-(d), (f)-(j), and (m) of the Amended Complaint. Consequently, the claims in those subparagraphs are dismissed without prejudice.

### 2. Contract Claims Against Bordak

Defendants also argue that because plaintiff has not pled that there was privity of contract between plaintiff and Bordak, plaintiff's contract claims against Bordak must be dismissed. This Court agrees. In Pennsylvania, "it is a basic tenet of agency law that an individual acting as an agent for a disclosed [principal] is not personally liable on a contract between the [principal] and a third party unless the agent specifically agrees to assume liability." *Casey v. GAF Corp.*, 828 A.2d 362, 369 (Pa. Super. 2003) (alteration in original) (quoting *B & L Asphalt Indus., Inc. v. Fusco*, 753 A.2d 264, 270 (Pa. Super. 2000)). It is admitted that Bordak was an employee of the University. Therefore, he may be liable for breach of contract only if he assumed liability, and that is not alleged in the Amended Complaint. Thus, plaintiff's contract claim against Bordak is dismissed without prejudice.

### B. Violation of Title IX

Defendant next argues that plaintiff has failed to allege facts supporting a claim under Title IX. Congress enacted Title IX, 20 U.S.C. §§ 1681–88, "to supplement the Civil Rights Act

of 1964's bans on racial discrimination in the workplace and in universities" with a ban on sexual discrimination in universities. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994). Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). A federal court is not bound by any theory or framework in evaluating claims under Title IX, *cf. Doe v. Cummins*, 662 F. App'x 437, 451 (6th Cir. 2016), and regardless of any theory or framework set forth by the parties, a plaintiff must plead facts supporting an inference that "the conduct of the university in question was motivated by a sexual bias," *Mallory v. Ohio Univ.*, 76 F. App'x 634, 638 (6th Cir. 2003). A "conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss." *Yusuf*, 35 F.3d at 715.

In this case, plaintiff contends that he has stated a claim under the "Erroneous Outcome" and "Selective Enforcement" theories. Doc. No. 9 at 8. Under the Erroneous Outcome theory, a plaintiff "must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding . . . [and] also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Yusuf*, 35 F.3d at 715. Under the Selective Enforcement theory, a plaintiff "asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id.* at 715. He has failed to do so.

### 1. *Title IX Claim Against the University*

The Amended Complaint does not allege facts supporting an inference that the University's conduct was motivated by gender bias. Such allegations might include "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns

of decision-making that also tend to show the influence of gender." *Yusuf*, 35 F.3d at 715. Inferences of gender bias may also be inferred from allegations that similarly situated individuals were treated differently or that university administrators faced outside pressure to discriminate against one sex or gender. *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016); *Doe v. Columbia Univ.*, 831 F.3d 46, 58 (2d Cir. 2016). There are no such allegations in the Amended Complaint.

Plaintiff has not alleged that members of the disciplinary tribunal or university staff made statements evincing bias or that the university faced outside pressure to discriminate against males. He does allege that the "biased and one-sided process [at the University] deprives male students of educational opportunities on the basis of gender," but this allegation is conclusory and is disregarded in assessing the sufficiency of the Amended Complaint. The Amended Complaint also avers that the investigation was "based upon the facts presented by three female Caucasian students [which] indicate[] that [Shapren] was biased against Powell due to his race and gender." Am. Compl. ¶¶ 54, 60. These allegations are also conclusory and do not support a reasonable inference of gender bias on the part of the University. Consequently, plaintiff's claim under Title IX against the University is dismissed without prejudice.

### 2. *Title IX Claim Against Bordak*

Defendants also argue that Bordak cannot be held liable under Title IX, as its provisions do not apply to individuals. "Title IX reaches institutions and programs that receive federal funds . . . but it has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals" as they are not educational programs receiving federal funding. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009). The Third Circuit has adopted this reasoning in ruling that individuals may not be liable under the Rehabilitation Act, 29 U.S.C.

§ 794, an analogous statute that prohibits discrimination against persons with disabilities by a "program or activity receiving Federal financial assistance." *Emerson v. Thiel Coll.*, 296 F.3d 184, 190 (3d Cir. 2002). The Third Circuit reasoned that "[b]ecause [] individual defendants do not receive federal aid," they cannot be held liable under the Rehabilitation Act and that "[t]his result is consistent with decisions finding no individual liability under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), which prohibits discrimination on the basis of sex by an education program or activity receiving federal funding." *Id.* Bordak is an individual who did not receive federal funding. Thus, plaintiff's claim against Bordak under Title IX is dismissed with prejudice.

### C. Negligence

Defendants argue that plaintiff's claim for negligence is barred by the gist of the action doctrine. Pennsylvania courts apply the "gist of the action doctrine" to "maintain the conceptual distinction between breach of contract claims and tort claims." *eToll, Inc. v. Elias/Savion Advert.*, 811 A.2d 10, 14 (Pa. Super. 2002) (internal citations omitted). Although claims for breach of contract and negligence "derive from a common origin," tort actions stem from "breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus." *Bash v. Bell Tel. Co.*, 601 A.2d 825, 829 (Pa. Super. 1992) (quoting *Iron Mountain Security Storage Corporation v. American Specialty Foods, Inc.*, 457 F.Supp. 1158, 1165 (E.D.Pa.1978)). Consequently, the doctrine has been variously stated to bar negligence claims "(1) arising solely from a contract between the parties (2) where the duties allegedly breached were created and grounded in the contract itself (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract." *eToll*, 811 A.2d at 19 (internal quotations omitted) (citations omitted).

14

Plaintiff's negligence claims in this case are barred by the gist of the action doctrine. The duties owed by the defendants to plaintiff are premised entirely on the contractual relationship between the parties, and not on duties imposed as a matter of social policy. Plaintiff has not pointed to any duties defendants owed to plaintiff outside of the University's policies. Instead, plaintiff alleges that Shapren did not notify the University of the "other conduct" discovered in his investigation, that he utilized the incorrect standard for "harassment," and that the University did not provide him the academic freedom guaranteed by University policies. Am. Compl. ¶¶ 18, 23-24, 26-27, 28-30, 33. These allegations aver only breaches of duties imposed by the parties' contractual agreement, and the gist of the action doctrines bars claims for negligence based on these allegations. *Reardon v. Allegheny College*, 2007 PA Super 160, 926 A.2d 477 (Pa. Super. 2007) (ruling negligence claims were barred by the gist of the action doctrine where the university policies "represent[ed] the sole basis for the relationship between the parties").

In his negligence claim, plaintiff further avers that the University failed to properly train its employees. Am. Compl. ¶ 64. Plaintiff alleges that the University owed a duty to plaintiff "independent of its breach of contract" to properly train staff to provide fair investigations, adjudicate complaints of sexual misconduct, enforce the requirements of Title IX, and preserve evidence. Am. Compl. ¶ 66(a)-(h). This claim fails for two reasons. First, in sum, the claim alleges that University personnel failed to adhere to University policy. Thus, the claim is barred, as above, by the gist of the action doctrine. Second, the Amended Complaint alleges no facts to support an inference of inadequate hiring or training of Bordak and other employees by the University. At best, the Amended Complaint alleges that a University-hired investigator failed to follow one provision of University policy in conducting an investigation. These allegations are insufficient to state a claim for negligence for failure to train.

Courts applying Pennsylvania law have dismissed similar claims for failure to train under the gist of the action doctrine. In *Harris v. St. Joseph's Univ.*, No. 13-cv-3937, 2014 U.S. Dist. LEXIS 65452, at *18 (E.D. Pa. May 13, 2014), plaintiff alleged that Saint Joseph's University failed to "train its employees, agents or representatives in the proper method to thoroughly investigate and adjudicate, without bias, complaints of sexual misconduct." The *Harris* court dismissed the claims as barred by the gist of the action doctrine, reasoning that the claims arose "from the contractual relationship between plaintiff and SJU" and that the injuries flowing from the alleged negligence were identical to those from the alleged breach of contract. *Id.* at *20. This Court agrees with the decision in *Harris*. Thus, this Court concludes that plaintiff's negligence claims are barred by the gist of action doctrine and dismisses those claims with prejudice.

### D. Violation of the UTPCPL

Finally, plaintiff alleges that defendants' conduct violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Penn. Stat. § 201-1 *et seq.* "To bring a private cause of action under the UTPCPL, a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance." *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 438 (Pa. 2004).

Defendants argue that plaintiff's claim under the UTPCPL is barred by the "economic loss doctrine" based on the Third Circuit decision in *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 681 (3d Cir. 2002). This Court agrees. The economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract."[3]

---

[3] Courts have recognized that the gist of the action and economic loss doctrines operate "similarly." *Kimberton Healthcare Consulting, Inc. v. Primary PhysicianCare*, Inc., No. 11-4568, 2011 U.S. Dist. LEXIS 139980, at *19 (E.D. Pa. Dec. 6, 2011). Both doctrines serve to

*Id.* at 671 (quoting *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir. 1995)).  In *Werwinski*, the plaintiffs brought claims for breach of contract, intentional fraud, and violation of the UTPCPL after purchasing vehicles with faulty transmissions.  *Id.* at 664-65.  The Third Circuit affirmed the application of the economic loss doctrine to bar plaintiffs' UTPCPL claim, holding that the economic loss doctrine bars claims for intentional fraud where the "fraud claims . . . are intertwined with contract claims" and "the plaintiff can be made whole under contract law."  *Id.* at 678, 680.  Because the UTPCPL "is broad enough to encompass nearly every misrepresentation claim in the commercial sales context," the economic loss doctrine barred plaintiff's UTPCPL claim as duplicative of his contract claim.  *Id.* at 681.

Since *Werwinski*, however, the Pennsylvania Superior Court held in *Knight v. Springfield Hyundai*, 81 A.3d 940, 951 (Pa. Super. 2013), that the economic loss doctrine does not bar claims under the UTPCPL.  The Superior Court reasoned that the Pennsylvania Supreme Court has defined the economic loss doctrine as barring a "cause of action . . . for negligence that results solely in economic damages unaccompanied by physical injury or property damage."  *Id.* at 952 (quoting *Excavation Technologies, Inc. v. Columbia Gas Co. of Pennsylvania*, 985 A.2d 840, 841 (Pa. 2009)).  According to the Superior Court, UTPCPL claims are "statutory claims . . . and do not sound in negligence."  Thus, the *Knight* court ruled that the economic loss doctrine does not apply to those claims.  *Id.*

---

"determine whether tort claims that accompany contract claims should be allowed as freestanding causes of action or rejected as illegitimate attempts to procure additional damages for a breach of contract."  *Bohler-Uddeholm Am., Inc. v. Ellwood Grp.*, Inc., 247 F.3d 79, 103 (3d Cir. 2001).  Thus, the distinction between the two doctrines "is largely one of pedigree," as the economic loss doctrine "developed in the context of courts' precluding products liability tort claims in cases where one party contracts for a product from another party and the product malfunctions, injuring only the product itself."  *Id.* at *20 (E.D. Pa. Dec. 6, 2011) (quoting *Bohler-Uddeholm*, Inc., 247 F.3d at 104 n.11).  This Court, following the Third Circuit ruling in *Werwinski*, will use the term "economic loss doctrine" with respect to plaintiff's claim under the UTPCPL.

After the decision in *Knight*, the courts in this District have split over whether to follow

the Third Circuit in *Werwinski* or the Pennsylvania Superior Court in *Knight*.  *Compare Whitaker*

*v. Herr Foods, Inc.*, 198 F. Supp. 3d 476, 489 (E.D. Pa. 2016) (concluding that *Werwinski* is

binding on district courts); *McGuckin v. Allstate Fire & Cas. Ins. Co.*, 118 F. Supp. 3d 716, 720

(E.D. Pa. 2015) (same), *with Kantor v. Hiko Energy, LLC*, 100 F. Supp. 3d 421, 429 (E.D. Pa.

2015) (following *Knight*).

Courts within the Third Circuit are bound by previous holdings of the Circuit on matters

of state law, absent "a *clear* statement by the Pennsylvania Supreme Court to the contrary or

other persuasive evidence of a change in Pennsylvania law."  *Smith v. Calgon Carbon Corp.*, 917

F.2d 1338, 1343 (3d Cir. 1990) (emphasis in original); *accord Debiec v. Cabot Corp.*, 352 F.3d

117, 131 (3d Cir. 2003) (ruling that a previous holding by the Circuit is "is binding . . .

notwithstanding the contradictory Pennsylvania Superior Court opinions on th[e] issue");

*Whitaker*, 198 F. Supp. 3d at 489-90.  Thus, whether this Court is bound by *Werwinski*, a Third

Circuit case, or *Knight*, a Superior Court case, turns on whether *Knight* provides "persuasive

evidence of a change in Pennsylvania law."  For the three reasons below, this Court concludes

that it does not.

First, the Pennsylvania Supreme Court has applied the economic loss doctrine to bar a

private cause of action under other statutes.  In *Excavation Technologies, Inc. v. Columbia Gas*

*Co.*, 985 A.2d at 842-43 (Pa. 2009), the case relied upon by *Knight*, the Pennsylvania Supreme

Court held that the doctrine barred a private cause of action under Pennsylvania's One Call Act.

The One Call Act requires utility companies to mark gas lines upon request by an excavator.  *Id.*

In *Excavation Technologies*, a utility company incorrectly marked certain gas lines, and the

plaintiff sued for negligent misrepresentation, arguing that the One Call Act created a statutory

duty to accurately mark the lines. *Id.* at 842. The trial court granted defendant's demurrer because the economic loss doctrine precluded liability for the plaintiff's economic losses. *Id.* at 841-42.

In affirming the trial court, the Pennsylvania Supreme Court held, in part, that the economic loss doctrine barred a private cause of action under the Act. The court reasoned that the "legislature was presumably aware of the economic loss doctrine when it established the statutory scheme governing the relationship among the entities required to participate under the Act." *Id.* at 843. Because the legislature did not abrogate the economic loss doctrine in the language of the Act, the Pennsylvania Supreme Court concluded that the Act "did not provide a private cause of action for economic losses." *Id.* at 842-42, 844. Because the Act did not provide a private cause of action for economic losses, the plaintiff in *Excavation Technologies* could not bring a negligence claim for economic losses premised on the utility company's duties under the Act. *Id.* at 844. The Superior Court's opinion in *Knight* does not discuss whether the Pennsylvania legislature abrogated the economic loss doctrine in the UTPCPL, and the distinction in *Knight* between negligence claims and statutory claims is not persuasive given the reasoning in *Excavation Technologies.*

Second, even if the distinction identified in *Knight* between statutory claims and negligence claims is significant in analyzing the UTPCPL, the *Knight* court is inconsistent in its characterization of the UTPCPL. In its brief analysis of the economic loss doctrine, the *Knight* court concludes that claims under the UTPCPL are "statutory claims . . . and do not sound in negligence." *Knight*, 81 A.3d at 952. Nonetheless, in its analysis of the related gist of the action doctrine, the *Knight* court reaches the opposite conclusion. *Id.* at 951. In that part of the opinion, the court concludes that claims under the UTPCPL are not barred by the gist of the

action doctrine, because the UTCPL claims "are not masked claims for breach of contract; the gist of the action here is in tort, and the contract is collateral to the matters alleged." *Id.* at 951. Because of its contradictory characterizations of claims under the UTPCPL, *Knight* is of limited persuasive value.

Finally, the reasoning in *Knight* is perfunctory and rests on the Pennsylvania Supreme Court's gloss that the economic loss doctrine precludes a "cause of action . . . for negligence that results solely in economic damages," without any analysis of the doctrine itself. *Knight*, 81 A.3d at 952 (quoting *Excavation Technologies*, 985 A.2d at 841). The Pennsylvania Supreme Court has recognized that this statement of the economic loss doctrine is incomplete, because tort actions for "legal malpractice, accountant malpractice, and architect liability" nonetheless allow for recovery of purely economic losses. *Bilt-Rite Contractors, Inc. v. Architectural Studio*, 866 A.2d 270, 288 (2005). Instead, the doctrine "turns on the determination of the source of the duty plaintiff claims the defendant owed." *Id.* If the breach of a duty arises under the provisions of a contract—as in this case—the breach "must be redressed under contract, and a tort action will not lie." *Id.* (quoting *Tommy L. Griffin Plumbing & Heating Co. v. Jordon, Jones & Goulding, Inc.*, 463 S.E.2d 85, 88 (S.C. 1995)). The Superior Court did not analyze the UTPCPL in terms of the source of the parties' duties, while the Third Circuit did so in *Werwinski*. Given the brevity of its analysis, *Knight* is not persuasive.

The question before this Court is not whether the rule in *Werwinski* or *Knight* is correct, but whether *Knight* provides "persuasive evidence of a change in Pennsylvania law." This Court concludes that it does not. Consequently, this Court will follow the holding in *Werwinksi* that the economic loss doctrine bars claims under the UTPCPL that are "intertwined with contract claims." As noted above, plaintiff's claims in this case are premised on the contract between him

and the University.  The Court concludes that the economic loss doctrine bars plaintiff's claim under the UTPCPL and dismisses that claim with prejudice.

### E.  Supplemental Jurisdiction

When a district court "has dismissed all claims over which it has original jurisdiction," it "may decline to exercise supplemental jurisdiction" over any remaining state law claims.  42 U.S.C. § 1367.  The court's decision to continue exercising supplemental jurisdiction is discretionary.  *Carlsbad Technology, Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009).  If the case was removed from state court, the federal court may issue an order remanding the case.  *Id.* at 640.

This Court will continue to exercise supplemental jurisdiction over the remaining claims in this case.  The parties have already supplied substantial briefing to the Court, allowing it to become familiar with the issues in the case.  Remanding to the Court of Common pleas would only require a duplication of the judicial resources already invested by this Court.  Further, plaintiff could feasibly amend his Title IX claim to include allegations supporting an inference of gender bias, thereby reinstating the federal claim over which this Court has original jurisdiction.

## V.  CONCLUSION

For the foregoing reasons, defendants Saint Joseph's University and William Bordak's Motion to Dismiss Plaintiff's Amended Complaint is granted in part and denied in part.  With respect to Count I of the Amended Complaint for breach of contract against the University, the Motion is granted without prejudice, except to the extent plaintiff avers in subparagraphs 49(a)-(b) and (e) of that Count that the University failed to provide plaintiff notice of and an opportunity to respond to the charges against him under the PPDHR, as to which the Motion is denied.  Count I of the Amended Complaint against Bordak is dismissed without prejudice.

Likewise, Count II of the Amended Complaint for violation of Title IX, 20 U.S.C. § 1861, is dismissed without prejudice as to the University and dismissed with prejudice as to Bordak.

Finally, Counts III and IV of the Amended Complaint against the University and Bordak for negligence and for violation of Pennsylvania's Unfair Trade Practice and Consumer Protection Law, 73 Penn. Stat. § 201-1 *et seq.*, respectively, are dismissed with prejudice.

The claims under subparagraphs 49(a)-(b) and (e) of the Amended Complaint are the only remaining claims in the case on the present state of the record.

"[I]f a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. County of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008). The Court does not find amendment would be inequitable or futile with respect to Count I against the University and Bordak or Count II against the University. Thus, plaintiff is granted leave to file an amended complaint within twenty (20) days with respect to Counts I and II if warranted by the facts and applicable law as stated in this Memorandum. An appropriate order follows.